(61 Misc. Rep. 28.)

### TOWN OF LENOX v. STATE.

(Court of Claims of New York. October, 1908.)

1. STATES (§ 191*)—WIDENING AND DEEPENING OF DITCH—LIABILITY FOR DAMAGES.

Under Canal Law (Laws 1894, p. 629, c. 338) § 37, one injured by the widening and deepening of a ditch used by the state to convey the surplus waters of the Erie Canal into Oneida Lake may prosecute his claim for damages without any other legislative authority.

[Ed. Note.—For other cases, see States, Cent. Dig. §§ 179, 182; Dec. Dig. § 191.*]

2. STATES (§ 191*)—CLAIMS AGAINST STATE—DESTRUCTION OF BRIDGES—DAMAGES.

Where the work of widening and deepening a ditch used to convey the surplus waters of the Erie Canal into Oneida Lake was negligently done,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

whereby two highway bridges were destroyed, the town in which the bridges were situated may maintain a claim therefor against the state.

[Ed. Note.—For other cases, see States, Cent. Dig. § 182; Dec. Dig. § 191.*]

Prosecution by the Town of Lenox of claims against the State for the destruction of bridges by negligence in widening and deepening a state ditch. Judgment for claimant.

Briggs & Wallace, for claimant.

William S. Jackson, Atty. Gen., and George P. Decker, Deputy Atty. Gen., for the State.

RODENBECK, J.   These are claims filed by the town of Lenox for the destruction of two bridges known as the Peterboro and Main street bridges, due to the deepening and widening of the so-called "state ditch" which they spanned. This ditch is used as a means of conveying the surplus water from the Erie Canal into Oneida Lake. Above the canal there are two or three streams that unite to form what was formerly known as "Cowasselon Creek," which flowed underneath the canal and thence a distance of several miles to Oneida Lake. When the state began to use this creek for discharging surplus water from the Erie Canal does not appear. The evidence, however, shows that as early as 1874 an act was passed by the Legislature authorizing the canal commissioners in charge of the middle division of the Erie Canal to widen and deepen the Stroud, Chapman, Olcott, and Douglass ditches, so called, in Cowasselon swamp, and to dig and construct such new ditches as might be necessary to drain the swamp and low lands of the surplus water of the Erie Canal. This act is chapter 244, p. 296, of that year, and made an appropriation for doing the work. It abundantly appears, from the evidence, that the creek or ditch was used by the state for canal purposes. These claims arise out of the passage of another act of the Legislature, in 1895, under which the creek or ditch was still further deepened and widened. This act is chapter 366, p. 185, of that year, and provides that the Superintendent of Public Works is authorized and directed to cause to be widened, deepened, cleaned out, and improved the state ditch in Cowasselon swamp in the towns of Lenox and Sullivan, Madison county, commonly known as the Stroud, Chapman, Olcott, and Douglass ditches "through which the surplus waters of the Erie Canal were discharged at the Cowasselon creek wasteweir, so that said ditch will perfectly convey and discharge such waters, without overflowing its banks or obstructing or interfering with the drainage of the lands lying adjacent to said ditch." Under this statute the work was done in the years 1895 and 1896 by the state through contracts, and the ditch was deepened from a point 40 or 50 feet downstream from the Peterboro bridge to and beyond the Main street bridge and at the outlet of the ditch into Oneida Lake. No excavation was made above the Peterboro bridge, but below the bridge and down the stream the creek was deepened about two feet and widened three or four feet on each side. Before the improvement, the creek was eight feet in width at its bottom, and this width was increased to sixteen feet. Underneath

the Main street bridge there was an excavation of two feet, and it was carried within a foot or two of the abutments of the bridge. Where the ditch empties into the lake there was a rock bottom, which was cut down several feet to afford a deeper draught. In times of low water, there were not over ten inches of water under Main street bridge; and after the improvement there was a hole as deep as six feet. The two bridges were over 20 years old at the time of the improvement, and were of the iron truss form common in the days of their construction. So far as the evidence shows, they were in good condition for public travel at the time of the deepening and widening of the ditch. It is claimed that the improvement caused a stronger current in the ditch, which undermined the abutments of the two bridges, causing the abutments to crack and the bridges to become unsafe, and rendering their replacement necessary by the town.

The claims are challenged by the learned Deputy Attorney General, on the ground that the court has no jurisdiction of them, no enabling act having been passed authorizing the presentation of the claims to the court. This position is not well taken, as the claims arise out of the operation and maintenance of the Erie Canal, which claims do not require any special legislative authority for their consideration by the Court of Claims. As stated above, the ditch, the waters of which it is claimed caused the destruction of the two bridges, is used by the state for the purpose of taking care of the surplus water of the Erie Canal. This fact makes the ditch a part of the canal system of the state, and, under section 37 of the canal law (Laws 1894, p. 629, c. 338) which is a substantial re-enactment of the Laws of 1870, p. 749, c. 321, a claim for the damages sustained by the town may be presented. This statute provides that:

"There shall be allowed and paid to every person sustaining damages from the canals or from their use or management, or resulting or arising from the neglect or conduct of any officer of the state having charge thereof, or resulting or arising from any accident, or other matter or thing connected with the canals, the amount of such damages to be ascertained and determined by the proper action or proceedings before the court of claims."

The usual proviso accompanies the section, that no recoveries shall be had unless the facts proved make out a case which would create a legal liability against the state were the same established in a court of justice against an individual or corporation. This language gives the town of Lenox a claim against the state for the destruction of the two bridges in question, if a state of facts is presented which would create a legal liability were the action one against an individual or corporation. Town Law (Laws 1890, p. 1237, c. 569) § 182; Highway Law (Laws 1890, p. 1181, c. 568) § 19; Bidelman v. State, 110 N. Y. 232, 18 N. E. 115, 1 L. R. A. 258. There is abundant authority for filing a claim in the name of a town. Town of Palatine v. Canajoharie Water Supply Co., 90 App. Div. 548, 86 N. Y. Supp. 412; Town of Ft. Covington v. United States & Canada R. Co., 8 App. Div. 223, 40 N. Y. Supp. 313; Town of Southeast v. City of New York, 96 App. Div. 598, 89 N. Y. Supp. 630.

The ditch or creek was used by the state for the purpose of discharging surplus water from the canal. It does not appear how this

right was acquired; but, as early as 1874, the proofs show that the state assumed jurisdiction over the creek by providing for widening and deepening it and making an appropriation therefor. It must be assumed, therefore, that. the state lawfully, if not by purchase, at least by lapse of time, acquired the right to discharge the surplus water of the canal into the ditch; but this right would not authorize it to widen or deepen the ditch to the damage of private or corporate interests. The work of widening and deepening the ditch was done by contract, under the supervision of state officers; and the effect of the improvement, as stated, was to increase the rapidity of the flow of water in the ditch. Witnesses upon the effect of the improvement of the stream testified as follows:

"It ran a good deal swifter." "Considerably faster. It made quite a stream there after we bottomed it out." "After that ditch—the Douglass ditch was lower. It left this water going over rapidly, and it washed the ditch out still deeper." "I watched that bridge [meaning the Main street bridge] and told them I would—and in going through there it narrowed up the channel and formed a little eddy; and in the middle of the creek down to abutments I should think there was a hole there six or eight feet, and they put in some cobblestones on each side." "We put cobblestones on each side of the abutments to hold it." "It ran after the enlargement of it; it ran more swiftly; instead of going off on the land, it went down through the creek, and it went with more force and more rapidly." "Q. From your observation of that, do you think these abutments slumped off into this quicksand by washing off that clay? A. Yes, sir."

No evidence was introduced on the part of the state to disprove the attempt made by the claimant to connect the destruction of the bridges with the negligent improvement of the ditch; and we must accept the proofs of the claimant, however meager, as establishing this connection. It appears that the year after the improvement one witness observed the scouring out of the ditch by the rapid water, and another witness testified that in 1898 the creek had begun to affect the abutments of the bridge. The abutments first received serious attention by the Highway Commissioner who went into office in 1901. He stated:

"I noticed the abutments cracking, and I examined them every spring, and I looked it over, and I saw the water was washing under it, and I went to Stroud and had a lot of stone brought, and had it thrown in to prevent the water going in that way; * * * finally, I had Mr. McPherson brace it with timbers. * * * I saw the abutments stood way up above the level of the creek. * * * I went and got plank in it, and had them shortened and drove down, and I had cobblestone thrown next to those planks and held them there. * * * We tried to save it [Peterboro bridge], and, finally, he [McPherson] said he couldn't do it."

˚ He also testified that he had seen the Superintendent of Canals for the Middle Division of the state, and that he had, sent some one to look over the bridges, but that the state refused to reconstruct them. He testified that, at the time of their reconstruction, they were unsafe for travel. This evidence, uncontradicted, sufficiently connects the destruction of the bridges and the necessity for their replacement with the negligent acts of the state in improving the ditch, in view of the statement of the engineer for the claimant, also uncontradicted, that the life of these bridges was practically indefinite.

If· the state is liable, the next question is as to the amount of such liability. The town rebuilt both bridges, making the Peterboro bridge two feet longer and the Main street bridge fifteen feet longer than the old one, and adopting a more modern and heavier style of bridge. The width of the new bridges is substantially the same as that of the old ones. The town appropriated the old bridges, placing one of them over a creek and storing ·the other. It appears that the cost of the abutments for the new structures would have been substantially the same if they had been put in the location of the abutments of the old bridges, but it appears that such location for the abutments was impracticable. The construction of longer bridges was not a mere fancy of the town, but was made necessary by reason of the widening of the channel by the state. By reason of this act of the state, no safe foundation could be secured at the location of the old abutments. Before the actual work of reconstructing the bridges was undertaken, it was necessary for the town to do some work to preserve the bridges, and some temporary bridges were constructed for the use of the public. The town is entitled to these incidental expenses and to the cost of constructing the new abutments; but, when the item of the superstructure of the bridges is reached, there must be taken into account the fact that a stronger and better bridge was constructed by the town than originally existed at these two highways. The state is liable for such damages as the town sustained by reason of its act in deepening and widening the ditch, but not for the expense of building a more elegant or stronger bridge than the one which existed previous to the negligent act of the state. It appears, from the testimony of one of the witnesses of the claimant, that a bridge similar to the Peterboro bridge which existed at the time of the deepening and widening of the ditch could be built for $320, of the same length as the new bridge— that is, two feet longer than the old bridge—and that a bridge similar to the old bridge which existed at Main street, but fifteen feet longer, could be built for $450 to $475. These items are the measure of the damages that the town has sustained from the acts of the state, rather than the items of $700 and $1,215, respectively, the cost of the superstructures ·which were actually put up by the town. The damages which the town sustained should be reduced to the extent of the value of the two bridges which it appropriated, which were estimated by its own witnesses at about $100 for the Peterboro bridge, which would also represent the value of the Main street bridge.

The town, therefore, should be allowed the following items of expense due to the reconstruction of the two bridges: Peterboro bridge: New abutments, $975; bracing, $25.10; temporary bridge, $30.50; superstructure, $320; inspection, $32—making a total of $1,382.60. From this amount should be deducted the value of the old bridge, $100; leaving $1,282.60 as the amount of the damages. Main street bridge: New abutments, $1,344.48; superstructure, $475; temporary bridge, $24.75; teamwork, $70; surveyor, $28; inspection, $40; stone, $43.20; use of land, $20; engineer, $54.48; removing bridge, $52; lumber, $84.10—making a total of $2,236.01. From this amount, deducting the value· of the old bridge, $100, leaves the damage $2,136.01.

The claimant, therefore, is entitled to a judgment in claim No. 8,172

of $1,282.60, and in claim No. 8,710 of $2,136.01, with interest from the dates respectively of filing the claims.

Judgment for claimant.